DENTONS US LLP
Brian S. Cousin, Esq. (038391988)
Marc S. Friedman, Esq. (268601971)
Jonathan S. Jemison, Esq. (030251999)
Lindsay F. Ditlow, Esq.  (016452006)
101 JFK Parkway
Short Hills, New Jersey 07078
Phone: (973) 912-7100
Fax: (973) 912-7129
*Attorneys for Plaintiffs*

| | |
|---|---|
| PRECISION SPINE, INC., SPINAL USA, INC. f/k/a Spinal USA, LLC, and PRECISION MEDICAL, INC. f/k/a Precision Medical of Mississippi, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ZAVATION, LLC, J2 MANUFACTURING, LLC and JEFFREY JOHNSON, <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> CHANCERY DIVISION:  MORRIS COUNTY <br><br><br> Docket No.: MRS-C-_____ <br><br> **COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF** |

Plaintiffs Precision Spine, Inc. ("PSI") and its wholly-owned subsidiaries, Spinal USA,

Inc. f/k/a Spinal USA, LLC ("Spinal") and Precision Medical, Inc. f/k/a Precision Medical of

Mississippi, LLC ("PM") (collectively, "Precision Spine" or "Plaintiffs"), by and through their

attorneys Dentons US LLP, as and for their Complaint against defendants Zavation LLC

("Zavation"), J2 Manufacturing, LLC ("J2") and Jeffrey Johnson ("Johnson") (collectively

"Defendants"), hereby allege and state as follows:



**EXHIBIT 3**

## NATURE OF THE ACTION

1.     This action arises out of a calculated and malicious scheme by Johnson, the former President, Treasurer, Secretary and Founding Member of Spinal, a wholly owned subsidiary of PSI, to steal Precision Spine's confidential and proprietary information, trade secrets, and employees in order to unlawfully compete with Precision Spine.

2.     Specifically, in blatant disregard of his ongoing contractual obligations to Spinal, soon after he left Spinal's employ in January 2010, Johnson formed a competing spinal products company, Zavation, which commenced marketing a line of spinal products modeled after the products created and sold by Spinal. Unlike Spinal, Zavation did not develop its products lawfully. Rather, starting in about 2011, it hired key employees away from Precision Spine and, upon information and belief, tortiously interfered with those key employees' ongoing obligations not to disclose or use Precision Spine's confidential and proprietary information and trade secrets. Upon information and belief, Johnson's and Zavation's pattern of tortious conduct has been ongoing since 2011 and continues to this day. Indeed, Precision Spine has recently uncovered direct evidence confirming that Zavation and its manufacturing arm, J2, are improperly receiving Precision Spine's confidential and proprietary information and trade secrets from current Precision Spine employees to sustain Zavation's business and unlawfully compete with Precision Spine.

3.     The Defendants embarked on this scheme to unlawfully compete with Precision Spine despite Johnson having entered into a settlement agreement with Spinal dated January 12, 2011 ("Settlement Agreement"), pursuant to which he agreed (1) for a period of one year, that he would not compete with Spinal's "Core Business" of creating and developing surgical devices and implants or employ Spinal's employees and (b) to maintain forever the confidentiality of the

2

company's confidential and proprietary information, as required by the terms of the August 29, 2009 Spinal USA, LLC Operating Agreement (the "Operating Agreement").

4.    In absolute secrecy, and with the intent to deceive Spinal, at the time Johnson entered into the Settlement Agreement he had already formed a competing medical device company named Zamedica, LLC (which later changed its name to Zavation, LLC) under the laws of the State of Mississippi. Rather than honor the contractual obligations of the Settlement Agreement, for which Johnson received substantial compensation, Johnson immediately breached those obligations, and has never honored them.

5.    On January 14, 2011, just two days after he signed the Settlement Agreement, Johnson filed with the United States Patent and Trademark Office ("USPTO") a trademark for the name "Zavation," in connection with "goods of metal for medical use, namely, screws, plates, pins and pivots; bone screws; medical screw connections; disposable screws used in surgery procedures." In June 2010, Johnson had filed a similar trademark application with the USPTO for the name "Zamedica."

6.    In or about January 2011 -- the same month he signed the Settlement Agreement -- Johnson lured Spinal's then Director of Engineering, John Lawrence Walker ("Walker") to leave Spinal and join Johnson at Zavation in breach of the Settlement Agreement Johnson had just signed.

7.    By August 2011, just seven months after Walker left Spinal, Zavation sought the approval of the U.S. Food and Drug Administration ("FDA") to market a spinal product equivalent[1] to a spinal product that Walker previously had developed at Spinal. Zavation quickly

---

[1] In order to obtain FDA approval under its Section 510(k) regulatory framework to market a spinal surgical device or related product, the FDA requires the manufacturer to establish that the mechanical features of its product are "substantially equivalent" to a predicate device that the FDA has previously approved. In order to satisfy this "equivalency" standard, spinal companies must develop testing data and demonstrate, through a detailed comparison

84723736

grew its product line over the next few years, developing and obtaining FDA approval to market products equivalent to those that Walker had developed for Spinal, repeatedly targeting Spinal's highest revenue generating products.

8.    Gradually over the course of the last 20 months, the Defendant entities induced and hired at least seven (7) Precision Spine employees, most of them key employees, including two engineers who developed spinal products for Precision Spine (Frankie Cummins and Milton Phillips), Precision Spine's Director of Manufacturing (Kyle Johnson), Precision Spine's Product Manager (Ryan Ratcliff) and, as a consultant, Precision Spine's Controller (Scott Smith).  In addition, three more employees resigned just this week (James Cochran, Deidred Hancock Garrett and Phillip Douglas), all reporting that they were leaving for a job with Zavation.

9.    Upon information and belief, Johnson, relying upon information known to him as a result of his prior employment with Spinal, and Zavation targeted those employees best suited to help Zavation quickly develop and obtain FDA approval for equivalent spinal products to those created and developed by Precision Spine because of their specific and unique knowledge of Precision Spine's confidential and proprietary product designs, manufacturing processes and testing procedures.

10.    At the time the Defendants targeted these Precision Spine employees, they knew each of them had signed confidentiality agreements that precluded them from disclosing such information to Zavation, and that some (Phillips, Cummins and Smith) had signed restrictive covenants that prevented them from working for Zavation after resigning their employment with Precision Spine.

---

of similar data derived from a predicate device, that the two products are equivalent.  Normally, that process is expensive and time consuming.

84723736

11.     Earlier this month, Precision Spine uncovered evidence confirming that Johnson and Zavation were not only hiring away key talent from Precision Spine, but receiving confidential and proprietary information and trade secrets from current Precision Spine employees, thus causing those employees to breach their fiduciary and/or contractual obligations to Precision Spine, while they were still employed by Precision Spine.

.   12.     For example, Precision Spine discovered in July 2015 that over the past year John Wilson ("Wilson"), a Precision Spine engineer, periodically sent confidential design and testing documents regarding Precision Spine's SureLOK™ *PC* Posterior Cervical System to his personal Yahoo email address, jnwilson157@yahoo.com. Precision Spine's SureLOK™ *PC* Posterior Cervical System is a valuable product, worth millions of dollars to the company. Collectively, the emails contain all of the pertinent documents relating to the design of this product, such as diagrams and computer aided design ("CAD") models, as well as all the testing data and studies that Precision Spine spent hundreds of thousands of dollars to compile in order to obtain FDA approval to market the product. Wilson did not work on the SureLOK™ *PC* Posterior Cervical System for Precision Spine and had no legitimate or authorized reason to send the information to his personal email address.

13.     As part of an internal investigation, on July, 22, 2015 interviewed Wilson. Wilson admitted that he sent these documents to his personal email account so that he could send them to his former boss at Precision Spine, Cummins, without Precision Spine's knowledge. Cummins had worked on Precision Spine's SureLOK™ *PC* Posterior Cervical System during his employment with Precision Spine. Cummins now works for Zavation.

14.     Initially, Cummins asked Wilson to send him testing data for Precision Spine's SureLOK™ *PC* Posterior Cervical System, and thereafter Cummins periodically requested

5

84723736

Wilson to send other documents regarding that product, including diagrams, CAD models and testing studies. Wilson complied.

15.    Wilson admits that the information he provided to Cummins was Precision's Spine's confidential and proprietary information, and that he repeatedly breached his contractual obligations to Precision Spine by downloading these documents from Precision Spine's network and forwarding them to Cummins from his personal email account. Upon information and belief, Cummins is developing a posterior cervical system for Zavation and asked Wilson to send him these documents for that purpose.

16.    On June 25, 2015, Wilson also sent to personal email address a schematic of Precision Spine's office layout. Upon information and belief, Zavation and J2 are planning to move into a new 25,000 square foot facility together, and Wilson sent this schematic to his personal Yahoo email address in order to send them to Zavation without Precision Spine's knowledge.

17.    Also in July 2015, Precision Spine learned that in April and May of 2015 James Cochran ("Cochran"), sent four separate emails from his Precision Spine email account to Kyle Johnson at J2 that contained Precision Spine's confidential computer programming information and calculations regarding its SureLOK™ *PC* Posterior Cervical System. The information Cochran provided is extremely valuable, particularly to a manufacturer like J2, as it details how to manufacture Precision's Spine product. When he sent a detailed spreadsheet with the manufacturing data in April 2015, Cochran reported: "This is the latest ... ." Cochran later explained in an email how to read the spreadsheet he provided. Cochran breached his contractual and fiduciary obligations to Precision Spine by disclosing this confidential information to Kyle Johnson and J2.

6

18.     As part of the internal investigation referred to above, Precision Spine interviewed Cochran on July 22, 2015.  Cochran admitted that he sent these documents to Kyle Johnson at J2 Manufacturing, but denied that he did anything wrong, insisting that the data he sent was generic, and not confidential.  Cochran later conceded, however, that the data he sent was generated in accordance to the design specifications developed and owned by Precision Spine.  Thereafter, Precision Spine inspected Cochran's Precision Spine computer and learned that Cochran had copied onto a removable disk program files and manuals of Precision Spine machines that were not related to his job function at all.

19.     Precision Spine also learned within the past few weeks that, before resigning from Precision Spine in March 2014, Kyle Johnson had been communicating with at least two parts manufacturers on behalf of Zavation and Johnson.  Upon information and belief, Kyle Johnson also downloaded confidential and proprietary information owned by Precision Spine onto his personal USB flash drive.  Moreover, during the last three months of his employment with Precision Spine, phone records reflect hundreds of phone calls between Kyle Johnson (using his Precision Spine-issued phone) and Jeffrey Johnson.  Upon information and belief, after Kyle Johnson left Precision Spine's employ, he formed a separate manufacturing company, J2, to manufacture products for Zavation.  Kyle Johnson, Precision Spine's former Director of Manufacturing, now serves as the President of J2.  Zavation and J2 operate out of the same facility located at 400 Liberty Drive in Flowood, Mississippi.

20.     Prior to leaving Precision Spine's employ, Kyle Johnson was specifically asked by executive management if he was going to work with or for Johnson.  He denied going to work for Johnson, concealing his true intentions to Precision Spine, in bad faith.

7

21.     These recent discoveries are only the latest in a series of surreptitious, tortious acts by Defendants to further Johnson's goal of using Precision Spine's work-force and intellectual property to form a competing spinal business without having to expend the time, effort and money to develop its products and obtain the necessary FDA approvals to market them lawfully.  Upon information and belief, Defendants have been engaged in this pattern of unlawful conduct for years and, as a result of this campaign to steal talent, confidential and proprietary information and trade secrets from Precision Spine, Zavation has developed a line of substantially similar products in a fraction of the time and for a fraction of the cost.

22.     Through this lawsuit, Precision Spine seeks to stop and permanently enjoin Johnson, Zavation and J2 from, among other things, misappropriating Precision Spine's confidential and proprietary  information and trade secrets, and from hiring current and former Precision Spine employees who have disclosed and inevitably will disclose Precision Spine's trade secrets and confidential information, including Wilson and Cochran.  In addition, Precision Spine seeks to recover compensatory and punitive damages for the losses caused by Defendants' unlawful competition.

## THE PARTIES

23.     Precision Spine, Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business located at 5 Sylvan Way, 2nd Floor, Parsippany, New Jersey.  Precision Spine, Inc. is the parent corporation of two wholly-owned subsidiaries that develop and manufacture medical devices to support cervical and thoracolumbar procedures, Plaintiff Spinal USA, Inc. and Precision Medical, Inc., both of which it acquired in 2012.

24.     Spinal USA, Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business located at 5 Sylvan Way, 2nd Floor,

84723736

Parsippany, New Jersey. Spinal USA, Inc. is the successor-in-interest of Spinal USA, LLC, a

Mississippi limited liability company, by virtue of a May 2012 merger of Spinal USA, LLC with

and into Spinal USA, Inc., pursuant to which all of Spinal USA, LLC's real and personal

property, tangible and intangible, of every kind and description was transferred to Spinal USA,

Inc. Spinal USA, Inc. is a wholly-owned subsidiary of Precision Spine, Inc.

      25.    Precision Medical, Inc. is a corporation organized and existing under the laws of

the State of Delaware, located at 2030 Executive Drive, Pearl, Mississippi. Precision Medical,

Inc. is the successor-in-interest of Precision Medical of Mississippi, LLC, a Mississippi limited

liability company, by virtue of a May 2012 merger of Precision Medical of Mississippi, LLC

with and into Precision Medical, Inc., pursuant to which all of Precision Medical of Mississippi,

LLC's real and personal property, tangible and intangible, of every kind and description was

transferred to Precision Medical, Inc. Precision Medical, Inc. is a wholly-owned subsidiary of

Precision Spine, Inc.

      26.    Zavation, formerly known as Zamedica, LLC, is a limited liability company

formed under the laws of the State of Mississippi, with its principal place of business located at

400 Liberty Drive, Flowood, Mississippi 39232. Upon information and belief, Zavation is

owned by Jeffrey Johnson and multiple members of the medical community.

      27.    J2 is a limited liability company formed under the laws of the State of Mississippi.

On its website, J2 advertises that is a "contract precision manufacturer of implants and surgical

instruments." J2 operates from Zavation's facility at 400 Liberty Drive, Flowood, Mississippi

39232. Upon information and belief, J2 and Zavation are planning to move together to a new

25,000 square foot manufacturing facility.

84723736

28.     Upon information and belief, Johnson is a citizen of the State of Mississippi, residing at 709 Inheritance Place, Flowood, Mississippi 39322. Johnson is a former Founding Member, as well as President, Secretary and Treasurer of Spinal USA, LLC. Upon information and belief, Johnson currently is a Member and President of Zavation.

## JURISDICTION AND VENUE

29.     This Court has personal jurisdiction over Zavation, J2 and Johnson because they committed and continue to commit tortious actions directed at New Jersey to cause harm to a corporation with its headquarters and principal place of business in New Jersey.

30.     This Court also has personal jurisdiction over Johnson because the contract claims against him arise out of contractual obligations to Spinal USA, Inc., f/k/a Spinal USA, LLC, pursuant to the terms of the Settlement Agreement that was negotiated, in whole or in part, in New Jersey. Specifically, Jim Pastena, then President and CEO of Spinal, signed the Settlement Agreement on its behalf in New Jersey, and was involved in contract negotiations that took place in and between Mississippi and New Jersey.

31.     Venue is properly laid in Morris County pursuant to R. 4:3-2(a) because the causes of action asserted in this Complaint arose in Morris County and because Precision Spine's principal place of business is located in Morris County.

## ALLEGATIONS COMMON TO ALL COUNTS

32.     The spinal products market is a small, but highly competitive market. It includes a few large companies, a number of mid-sized companies, and a number of small start-up companies.

33.     Precision Spine is considered a mid-sized spinal company. With over 100 employees and over $50 million in annual revenues, it has the financial means to develop and market the large array of spinal products that Precision Spine has in its portfolio.

84723736

34.     Zavation is considered a small company in the market.  According to a recent Hoover's report, Zavation currently has nine employees and $0.91 million in annual sales. Typically, spinal companies the size of Zavation do not have the research and development budget necessary to develop and market a large portfolio of spinal and related products.

35.     Upon information and belief, Zavation has been able to develop a portfolio of spinal products almost as large as Precision Spine's portfolio by misappropriating Precision Spine's confidential and proprietary information and trade secrets, as detailed herein, and will continue to do so unless enjoined.

**Precision Spine's Business and Product Line**

36.     Founded as Spinal USA, LLC in 2005 by defendant Jeffrey Johnson, a salesman, and a number of medical professionals, Precision Spine is a spinal device company offering a full line of spinal pathology solutions to meet the needs of patients, surgeons and healthcare providers.

37.     As defined in the Operating Agreement, Spinal's "Core Business" includes "the creation, development, improvement, marketing and sale of surgical spinal implants and related spinal products," as well as "other surgical devices and related surgical devices" that may be developed in the future.  That "Core Business" remains the same today.

38.     After Johnson left Spinal's employ in 2010, the company conducted an overhaul in management.  Among other things, the new management began to shift the focal point of the business and, in particular, the epicenter of the engineering and product development process, from Mississippi to New Jersey.

39.     Since its formation, Precision Spine has created, developed, modified and/or improved an array of surgical devices, implants and related products for use in cervical and

11

thoracolumbar procedures, including (a) Precision Spine's uniplate product, called the

Slimplicity® SOLO, (b) its stand-alone surgical implant, called the Vault™ *C* ACDF System,

and (c) its SureLOK™ *PC* Posterior Cervical System.

40.    The Uniplate:  The "standard" device for anterior cervical plating has been a plate

with two bone screws at each cervical vertebra, four screws in total for a one level fusion (one

level consisting of two vertebrae with a disc between them).  Precision Spine's uniplate, known

as the Slimplicity® SOLO Anterior Cervical Plate System, is a cervical plate with one screw in

each vertebra, which reduces the surgical time, but also reduces torsion resistance of this fixation

system.  Only a select few companies have succeeded in obtaining FDA approval to market a

"uniplate," including Precision Spine and Zavation.  Precision Spine spent over three years and

hundreds of thousands of dollars in out of pocket expenses to develop the product and obtain

FDA approval in June 2012.

41.    Vault™ *C* ACDF System:  This is a "stand alone" implant used in spinal

surgeries.  It removes the requirement of a cervical plate by putting bone screws through the cage

and into each vertebra through the endplate.  Zavation's "Z-Link" is substantially similar to

Precision Spine's Vault™ *C* ACDF System.  Precision Spine spent 26 months and hundreds of

thousands of dollars in out of pocket expenses in order to develop the Vault™ *C* ACDF System

and obtain FDA approval in November 2013.

42.    SureLOK™ *PC* Posterior Cervical System:  This system uses bone screws placed

in the back of vertebrae and allows for rods to be placed into the heads of these screws to achieve

fixation for fusion.  Prior to Jim Pastena joining Precision Spine, the engineers working on the

product -- Walker and Cummins -- could not obtain approval for this product.  Engineers from

New Jersey redesigned the product and approval to market was obtained thereafter.  As detailed

84723736

below, Precision Spine recently learned that Zavation and J2 improperly obtained confidential and proprietary information about the design and manufacturing of Precision Spine's SureLOK® Posterior Cervical System from Precision Spine employees.  Upon information and belief, Zavation has used or intends to use Precision Spine's trade secrets and confidential information to develop its own posterior cervical system.  To date, Precision Spine has spent hundreds of thousands of dollars in out of pocket costs developing this product, which has a value to Precision Spine in excess of $5 million.

43.     Precision Spine's products also include (a) the "standard" Anterior Cervical Plate System, called Slimplicity®; (b) the ShurFit™ Cervical Cages; (c) a series of Interbody Cages designed for spinal fusion, (d) the Vault™ Stand-Alone ALIP System; (e) the SureLOK™ Pedicle Screw System, and (f) the Reform® Pedicle Screw System.

**Zavation's Business and Substantially Similar Product Line**

44.     As detailed below, in 2010 Jeffrey Johnson founded Zavation, a Mississippi medical device company that competes directly with Precision Spine in the development of surgical devices and implants for use in spinal procedures.

45.     Zavation has since developed its own line of products substantially similar to those developed and marketed by Precision Spine.  For example, Zavation's uniplate is nearly identical to Precision Spine's Slimplicity® SOLO uniplate and Zavation's "Z-Link Cervical" product is nearly identical to Precision Spine's Vault™ C.

13

46.   Upon information and belief, Zavation systematically developed its competing line of medical device products by focusing its efforts on obtaining approval for its own version of Precision Spine's highest revenue generating products at the time.

| Precision Spine Product(s) | Date Cleared | Equivalent Zavation Product(s) | Date Cleared |
|---|---|---|---|
| SureLOK™ Pedicle Screw System | 08/21/2007 | Zavation Spinal System | 11/22/2011 |
| Reform™ Pedicle Screw System | 09/14/2011 | None | |
| Slimplicity® Anterior Cervical Plate System | 04/18/2006 | Zavation Cervical Plate System | 12/08/2011 |
| ShurFit™ ALIF, LLIF, TLIF, TPLIF, PLIF, ACIF | 05/13/2008 | Zavation IBF system ALIF, LLIF, TLIF, T-PLIF, PLIF CIF | 12/23/2011 |
| ShurFit™ Cervical Cages | 05/13/2008 | Zavation IBF System | 03/28/2012 |
| Slimplicity® SOLO | 07/11/2012 | Zavation Midline Plate | 04/25/2013 |
| Vault™ C ACDF System | 11/25/2013 | Z-Link Cervical | 08/07/2014 |
| Vault™ Stand-Alone ALIP System | 04/04/2011 | Z-Link Lumbar (Coming Soon) | 12/19/2014 |
| ShurFit™ MALIF (non-expanding) | 05/13/2008 | Posterior LEIF (expanding) | 04/29/2015 |
| SureLOK™ PC Posterior Cervical System | 09/14/2011 | None | |

47.   Upon information and belief, Zavation developed these similar products by misappropriating Precision Spine's confidential and proprietary information and trade secrets, which it obtained by, among other things, hiring Precision Spine employees with specific and unique knowledge of Precision Spine's surgical devices and implants and encouraging them to take and/or disclose Precision Spine's trade confidential information and trade secrets in violation of their contractual obligations to Precision Spine.

84723736

## Jeffrey Johnson's Separates From Precision Spine

48.     Johnson was a Founding Member of Spinal USA, LLC and served as the company's President, Secretary and Treasurer until January 23, 2010, when the physicians that co-founded the company with Johnson and served on the company's Board of Managers removed Johnson from those positions.

49.     Despite being removed from those positions in January 2010, Johnson retained his membership interest in the company and, in turn, remained subject to the obligations contained in the Operating Agreement, as well as his fiduciary obligations to the company.

50.     Following Johnson's termination of employment, Johnson and Spinal asserted a number of claims against one another arising out of Johnson's prior employment with and management of Precision Spine. To resolve those claims and disputes, Johnson and Spinal entered into the Settlement Agreement on January 12, 2011, pursuant to which Johnson agreed to assign his entire membership interest in the companies and to abide by a series of covenants that served to protect the companies' business and confidential information in exchange for substantial consideration to be paid in three installments over time. All payments to Johnson were authorized and directed by executive management located in New Jersey. The final payment was paid by Precision Spine from New Jersey in December 2012.

51.     Specifically, among other things, Johnson expressly acknowledged and agreed that he was bound by certain terms and conditions of the "Covenant Not to Compete" contained in Article 6 of the Operating Agreement, which precluded Johnson from engaging or investing, "directly or indirectly, in any business in competition with" Spinal's "Core Business," as that term is defined in the Operating Agreement, for a period of one year following the execution of the Settlement Agreement. Johnson also agreed that he would not "employ or attempt to

15

employ" Spinal's employees for a period of one-year following execution of the Settlement

Agreement.

52.    In addition to the non-compete and non-solicitation covenants, the Settlement

Agreement made it abundantly clear that Johnson had no right to Spinal's confidential and

proprietary information and trade secrets, and that he would abide by the confidentiality

obligations contained in the Operating Agreement.

53.    Article 7 of the Operating Agreement, which was incorporated by reference into

the Settlement Agreement, defined "Confidential Information" to include "information that the

Company maintains in confidence and that has actual or potential economic value to the

Company because it is not generally known to others and is not readily ascertainable by them,"

including "information concerning the design and manufacture of Company products" and

"information in Company personnel files and similar files concerning Members, Officers,

Managers, and Employees."

54.    Finally, Johnson agreed in Paragraph 12 of the Settlement Agreement that certain

Spinal information that had been made available to him, or that he helped to create and develop,

belonged to Spinal.

**Johnson Secretly Forms Zavation, Which He Conceals From Spinal When He Enters Into
the Settlement Agreement.**

55.    Unbeknownst to Spinal at the time, six months after Johnson left Spinal's employ

-- and six months before he entered into the Settlement Agreement -- Johnson filed a Mississippi

LLC Certificate of Formation for Zamedica, LLC ("Zamedica"), effective as of August 2, 2010.

56.    As reflected in the trademark application Johnson filed with the USPTO for the

name "Zamedica" in June 2010, upon information and belief, the purpose of Zamedica was to

16

engage in the design, manufacture and sale of surgical devices that support cervical procedures, which was and is Precision Spine's "Core Business."

57.     On January 1, 2011, Johnson formally changed the name of his new company from Zamedica, LLC to Zavation, LLC, and on January 14, 2011, Johnson filed a trademark application with the USPTO for the name "Zavation," supplying the same description as he had in his previous trademark application for the name "Zamedica."

58.     Johnson concealed all of this information from Spinal when he entered into the Settlement Agreement.

**Johnson Commences a Campaign to Unlawfully Compete With Precision Spine, Never Once Honoring the Covenants in the Settlement Agreement**

59.     Weeks after Johnson entered in the Settlement Agreement and agreed to abide by the restrictive covenants imposed on him pursuant to the terms of the Operating Agreement, Johnson breached those obligations when his new company, Zavation, hired Walker, Spinal's former Director of Engineering.  As a key engineer, Walker had knowledge of all of Spinal's devices, studies, projected launch dates and customers -- all of which are Spinal's confidential and proprietary information, and trade secrets.

60.     Spinal had terminated Walker on January 25, 2011 because he was unwilling to execute a Non-Competition Agreement.  Upon information and belief, Walker was unwilling to sign such an agreement because he had already planned to assist Johnson with building Zavation.

61.     Johnson concealed from Spinal his plans to work with Walker when he entered into the Settlement Agreement.

62.     Although Walker had refused to enter into a Non-Competition Agreement, at the time of his termination he remained bound by the terms of a written employment agreement that,

17

among other things, prohibited him from disclosing "Confidential Information," as that term was defined in paragraph 2(b) of his employment agreement.

63.     In paragraph 2(b) of his employment agreement, Walker also expressly agreed to return all Confidential Information upon the termination of his employment with Spinal, and further agreed that any devices, designs, inventions and like materials that he developed during the term of his employment remained the exclusive property of Spinal, including Spinal's computer, handbooks, standard operating procedures, USB drives, and related media.

64.     Johnson was aware of Walker's contractual obligations to Spinal, as he counter-signed Walker's employment agreement in his capacity as President of Spinal USA, LLC.

65.     Notwithstanding their respective ongoing contractual obligations to Spinal, Johnson and Walker commenced developing a line of spinal medical devices and related products for Zavation, targeting Precision Spine's largest revenue generating products at that time and, upon information and belief, misappropriating Precision Spine's confidential and proprietary information and trade secrets to do so.

18

84723736

**Zavation Seeks FDA Approval For Competing Spinal Products Months After Walker Joined Forces With Johnson**

66.     In August 2011, seven months after Walker left Spinal's employ, Zavation filed with the FDA two Section 510(k) premarket notifications, indicating Zavation's intent to market the "Zavation Spinal System," which embraced a pedicle screw system, and the "Zavation Cervical Plate System," which consisted of the "standard" anterior cervical plate that pre-dated the uniplate. One month later, in September 2011, Zavation filed a Section 510(k) premarket notification indicating its intent to market the "Zavation IBF System." All three of these Section 510(k) notifications were filed by Walker.

67.     Prior to his employment with Spinal, Walker had experience in the aerospace industry. Spinal allocated significant resources to train and develop Walker's skill level for the spinal device industry.

68.     During his nearly two-year tenure at Spinal, Walker assisted in the development and testing of Spinal's SureLOK™ Pedicle Screw System, its Slimplicity® Anterior Cervical Plate System, and its ShurFit™ line of cervical and lumbar interbody cages.

69.     The Zavation Spinal System, Zavation Cervical Plate System and Zavation IBF System were and are directly competitive with Precision's "Core Business," as defined in the Operating Agreement.

70.     The Zavation Spinal System is equivalent to Precision Spine's SureLOK™ Pedicle Screw System. Indeed, recently one doctor confused a Zavation pedicle screw as one that had been manufactured by Precision Spine. The Zavation Cervical Plate System is equivalent to Precision Spine's Slimplicity® Anterior Cervical Plate System, and the Zavation IBF System is substantially similar to Precision Spine's ShurFit™ line of cervical and lumbar interbody cages.

19

71.   In 2011 and 2012, the time when Zavation sought and obtained FDA approval for the Zavation Spinal System and the Zavation Cervical Plate System, their Precision Spine counterparts, the SureLOK™ Pedicle Screw System and Slimplicity® Anterior Cervical Plate System, respectively, accounted for 50% of Precision Spine's revenues.

72.   Upon information and belief, Johnson, Walker and Zavation focused their efforts on developing and obtaining FDA approval to market products equivalent to those that Precision Spine had demonstrated to be successful, and misappropriated Precision Spine's confidential information to do so.

**Zavation Obtains Approval For Its Uniplate in April 2013**

73.   In or about 2013, Zavation's unfair competition with Precision Spine became harder to ignore when it developed and successfully obtained FDA approval for a uniplate that was substantially similar to Precision Spine's Slimplicity® SOLO, joining Precision Spine as one of the few spinal device companies cleared by the FDA to market a uniplate.

74.   Precision Spine had previously spent a great deal of time, effort, and money for its uniplate, investing hundreds of thousands of dollars over the course of about three years in developing and obtaining approval for the product. The FDA approval process for the uniplate was extremely arduous for Precision Spine. It took the submission of three applications over a period of nearly three years -- including testing data and other supporting documentation -- to convince the FDA to approve Precision Spine's uniplate product.

75.   Armed with Precision Spine's confidential, proprietary, and valuable information and data, Zavation's timeline to FDA clearance of its uniplate product was a mere 30 days -- far less then the length of time it took Precision Spine to obtain FDA clearance. Upon information and belief, Zavation was able to obtain FDA approval of its uniplate product on such an

20

accelerated schedule because it improperly utilized Precision Spine's confidential and proprietary information and documentation.

**Johnson and Zavation Raid Precision Spine's Workforce, Tortiously Interfere With the Confidentiality Obligations Owed By These Workers to Precision Spine, and Misappropriate Precision Spine's Confidential Information**

76.     The spinal device business is highly competitive.  As such, Precision Spine, like other companies in the spinal device business, take a number of steps to reasonably protect their confidential information and trade secrets.

77.     Among other things, as was the case with Walker, Precision Spine has at all relevant times required each of their employees to execute a confidentiality agreement requiring them not to improperly use or disclose Precision Spine's confidential and proprietary information and trade secrets.

78.     Precision Spine's Employee Handbook & Guidelines, which all employees were required to sign, reminded employees that they were prohibited from disclosing confidential information outside the Company "without proper authorization."

79.     Furthermore, certain Precision Spine employees, such as product development engineers, have at all relevant times been obligated to enter into non-competition agreements prohibiting them from working for a competing company for a reasonable period of time after the termination of their employment.

80.     In addition, when employees leave Precision Spine's employ they are required to return any and all Precision Spine confidential and proprietary information, documentation, and property in their possession, including any company computers that may have been issued to them.

81.     Upon information and belief, in the last 20 months at least seven employees (Phillips, Cummins, Kyle Johnson, Smith, Ratcliff, Page and Carroll), five of them key, have left

84723736

Precision Spine and gone to work for Johnson and Zavation (collectively, the "Former Precision Spine Employees"), and are working in similar positions for Zavation (or consulting with it) such that the Former Precision Spine Employees inevitably will disclose Precision Spine's confidential and proprietary information and trade secrets.

82.    Upon information and belief, each of the Former Precision Spine Employees breached their ongoing contractual obligations owed to Precision Spine in connection with their employment or consulting agreement with Zavation.

83.    Upon information and belief, Johnson and Zavation had knowledge of the ongoing contractual obligations each of the Former Precision Spine Employees had, yet they tortiously interfered with those obligations for the benefit of Zavation.

### *James Milton Phillips*

84.    James Milton Phillips ("Phillips") worked as an engineer for Precision Spine from April 3, 2008 to October 31, 2013.  When Spinal hired Phillips, he had no experience in the spinal industry.  His experience came from the aerospace industry.  Precision Spine invested a significant amount of resources to develop Phillips' skills and expertise.

85.    On September 13, 2010, Phillips entered into a "Non-Competition and Confidentiality Agreement" with Spinal USA, LLC, pursuant to which Phillips agreed that, for a period of one (1) year after he ceased employment, he would "not engage in any business or perform any service, directly or indirectly, in competition with the Business of the Company" anywhere in the United States.

86.    Pursuant to Section 2.1 of that agreement, Phillips acknowledged that he would "obtain or be given access to" confidential information regarding Spinal and its business, including, but not limited to, "surgical implants, surgical devices, surgical products, surgical

22

equipment, inventions, intellectual property," and other information. Phillips further acknowledged that the disclosure of such information would harm the company and agreed that he would not "directly or indirectly use in any unauthorized manner, or disclose to any third party," Spinal's confidential and proprietary information.

87.   · Phillips further agreed that all inventions, designs, devices and like materials that he helped create, develop, modify or improve during his employment with the company "shall be and shall remain the exclusive property of the Company."

88.   Finally, Phillips agreed to return any confidential information in his possession at the time of his termination of employment.

89.   Prior to entering into the September 13, 2010 Non-Competition and Confidentiality Agreement with Spinal USA, LLC, Phillips had entered into an employment agreement which contained a substantially similar provision governing the protection of Spinal's confidential and proprietary information.

90.   Phillips was a valuable employee. His personnel file reflects that he consistently received high performance evaluations and commensurate raises as a result. Moreover, effective January 1, 2011, Phillips received 15,000 units of Class B Membership Interest in Spinal USA, LLC, which he received in exchange for executing the September 13, 2010 Non-Competition and Confidentiality Agreement referenced above.

91.   On October 17, 2013, Phillips provided written notice of his resignation of employment effective October 31, 2013. Upon information and belief, Phillips currently works for Zavation. Upon information and belief, Phillips joined Zavation in violation of his 1-year post employment non-competition obligations.

84723736

92.     During his five and one-half year tenure with Precision Spine, Phillips had access to the Precision Spine's confidential and proprietary information and trade secrets protected from disclosure by the terms of his agreements with the company.  Among other things, in his capacity as an engineer, Phillips helped develop Precision Spine's Vault™ product.  Just thirteen months after Phillips left Precision Spine, Zavation filed a Section 510(k) application with the FDA to market its substantially similar product, Z-Link Lumbar.  It took Precision Spine approximately 28 months and an investment of hundreds of thousands of dollars in out of pocket costs  to develop the Vault™ product.

93.     Upon information and belief, at the time Johnson and Zavation hired Phillips, they were aware of the terms of his Non-Competition and Confidentiality Agreement, yet tortiously interfered with Phillips' contractual obligations owed to PSI and the predecessor entities to Precision Spine by hiring him to perform similar services for Zavation.

94.     Upon information and belief, Phillips has been and is creating, developing, modifying and/or improving surgical implants and devices substantially similar to those he created, developed, modified, and/or improved while employed by Precision Spine.

### *John "Frankie" Cummins*

95.     John "Frankie" Cummins ("Cummins") worked as an engineer for Precision Spine from January 2, 2009 to January 24, 2014.

96.     When Spinal hired Cummins, he had no experience in the spinal industry.  His experience came from the aerospace industry.  Precision Spine invested a significant amount of resources to develop Cummins' skills and expertise.

97.     On January 24, 2011, Cummins entered into a "Non-Competition and Confidentiality Agreement" with Spinal USA, LLC, pursuant to which Cummins agreed that, for

24

a period of one (1) year after he ceased employment he would "not engage in any business or perform any service, directly or indirectly, in competition with the Business of the Company" anywhere in the United States.

98.   Pursuant to Section 2.1 of that agreement, Cummins acknowledged that he would "obtain or be given access to" confidential information regarding Spinal and its business, including, but not limited to, "surgical implants, surgical devices, surgical products, surgical equipment, inventions, intellectual property," and other information.  Cummins further acknowledged that the disclosure of such information would harm the company and agreed that he would not "directly or indirectly use in any unauthorized manner, or disclose to any third party," Spinal's confidential and proprietary information.

99.   Cummins further agreed that all inventions, designs, devices and like materials that he helped create, develop, modify or improve during his employment with Spinal "shall be and shall remain the exclusive property of the Company."

100.   Finally, Cummins agreed to return any confidential information in his possession at the time of his termination of employment.

101.   Prior to entering into the January 24, 2011 Non-Competition and Confidentiality Agreement with Spinal USA, LLC, Cummins had entered into an employment agreement which contained a substantially similar provision governing the protection of Spinal's confidential and proprietary information.

102.   Cummins was a valuable employee.  His personnel file reflects that he consistently received high performance evaluations and commensurate raises as a result. Moreover, effective January 1, 2011, Cummins received 30,000 units of Class B Membership

25

Interest in Spinal USA, LLC, which he received in exchange for executing the January 24, 2011
Non-Competition and Confidentiality Agreement referenced above.

103.    Further, on June 11, 2013, Precision Spine granted Cummins stock options to
purchase 2,500 shares in Precision Spine.

104.    On January 13, 2014, Cummins provided written notice of his resignation of
employment, effective January 24, 2014. At the time he tendered his resignation, Cummins cited
the long commute as a reason for his leaving, and that he intended to return to the aerospace
industry.

105.    Cummins was asked specifically if he was going to work for or with Jeffrey
Johnson. He replied "no."

106.    Contrary to the statements and representations made at the time of his resignation,
Cummins had no intention to return to the aerospace industry. Upon information and belief,
Cummins initially consulted with Zavation when he left Precision Spine in violation of his 1-year
post employment non-competition obligations, and then joined Zavation as an employee.

107.    During his five year tenure at Precision Spine, Cummins had access to Precision
Spine's confidential and proprietary information and trade secrets protected from disclosure by
the terms of his agreements with the company. In his capacity as an engineer, Cummins helped
develop, among other things, Precision Spine's Slimplicity® and Slimplicity® SOLO products,
as well as its Vault™ system, and the SureLOK™ *PC* Posterior Cervical System. The last two
products Cummins worked on for Precision Spine were the Slimplicity® SOLO and the
SureLOK™ *PC* Posterior Cervical System.

108.    Just ten months after Cummins left Precision Spine, Zavation filed a Section
510(k) application with the FDA to market its product, Z-Link Lumbar, which is substantially

26

84723736

similar to Precision Spine's Vault™ product. As stated above, it took Precision Spine approximately 28 months and an investment of hundreds of thousands of dollars to develop the Vault™ product.

109.     Precision Spine recently learned that over the past year Cummins contacted a Precision Spine engineer, Wilson, and frequently requested that Wilson send him testing data, diagrams, CAD models, and testing studies for Precision Spine's SureLOK™ *PC* Posterior Cervical System. Wilson complied, downloading the documents that Cummins requested from Precision Spine's network, emailing them to his personal email address, and then forwarding those emails to Cummins. As a result, Cummins is in possession of Precision Spine's confidential and proprietary information and trade secrets.

110.     Upon information and belief, at the time Johnson and Zavation hired Cummins, they were aware of the terms of his Non-Competition and Confidentiality Agreement, yet interfered with Cummins' contractual obligations owed to PSI and the predecessor entities to Precision Spine by hiring him to perform similar services for Zavation.

111.     Upon information and belief, Cummins has been and is creating, developing, modifying and/or improving surgical implants and devices substantially similar to those he created, developed, modified, and/or improved while employed by Precision Spine.

84723736

### *Justin Kyle Johnson*

112.    Justin Kyle Johnson ("Kyle Johnson") joined Precision Spine on August 25, 2008. He started as a manufacturing engineer and, by the time he left Precision Spine's employ on March 28, 2014, he served as Precision Spine's Director of Manufacturing.

113.    On August 25, 2008, Kyle Johnson entered into a Confidentiality Agreement with Spinal USA, LLC in order to gain access to Precision Spine's confidential information and trade secrets.

114.    Pursuant to his Confidentiality Agreement, Kyle Johnson acknowledged that he would "obtain or be given access to" confidential information regarding Spinal and its business, including, but not limited to, "employee information and personal data, surgical implants, surgical devices, surgical products, surgical equipment, inventions, strategic business plans, business and distribution models, business opportunities, intellectual property and trade secrets, processes, programs, techniques, methodologies, designs, prospects, customers, competitors, suppliers, pricing and other commercial, technical or operational information." Kyle Johnson further acknowledged that the unauthorized disclosure of such information would harm the company and agreed that he would not "directly or indirectly use in any unauthorized manner, or disclose to any third party," Spinal's confidential and proprietary information.

115.    Kyle Johnson further agreed that all inventions, designs, devices and like materials that he helped create, develop, modify or improve during his employment with the company "shall be and shall remain the exclusive property of the Company."

116.    Finally, Kyle Johnson agreed to return any confidential information in his possession at the time of his termination of employment.

28

117.   Kyle Johnson was a valuable employee. His personnel file reflects that he consistently received high performance evaluations and, as noted, had been promoted to Director of Manufacturing. Moreover, during the course of his employment, Kyle Johnson received 30,000 units of Class B Membership Interest in Spinal USA, LLC and stock options to purchase 3,000 shares in Precision Spine.

118.   On March 7, 2014, Kyle Johnson provided written notice of his resignation of employment, effective March 28, 2014. At the time he tendered his resignation, Kyle Johnson told Precision Spine's Chief Executive Officer, Jim Pastena, that he was not joining Zavation, but rather that he was setting up his own manufacturing shop.

119.   Contrary to the statements made at the time of his resignation, upon information and belief, Kyle Johnson works for Zavation and serves as President of J2, which, upon information and belief, is the manufacturing arm of Zavation.

120.   Moreover, Plaintiffs have recently discovered that Kyle Johnson had begun providing services to Zavation while he remained in Plaintiffs' employ. In fact, in the days leading up to the tender of his resignation, Kyle Johnson had been communicating with at least two different parts manufacturers on behalf of Zavation and, upon information and belief, at Jeffrey Johnson's behest, in breach of his duty of loyalty.

121.   Upon information and belief, Kyle Johnson downloaded confidential and proprietary information from his Precision Spine computer to a portable USB drive in violation of Precision Spine's Employee Handbook & Guidelines, which "strictly prohibited" Kyle Johnson from using the company's computer for "sending, receiving, displaying, printing or otherwise disseminating confidential, proprietary business information or trade secrets in violation of company policy or proprietary agreements."

29

122.   Phone records reflect that between December 1, 2013 and March 1, 2014, Kyle Johnson and Jeffrey Johnson called one another hundreds of times.

123.   During his five and one-half year tenure at Precision Spine, Kyle Johnson had access to Precision Spine's confidential and proprietary information and trade secrets protected from disclosure by the terms of his agreement with the company.  Among other things, as a manufacturing engineer and the Director of Manufacturing, Kyle Johnson had access to confidential and proprietary information about Precision Spine's manufacturing processes for each of its products.

124.   Upon information and belief, Kyle Johnson has been and is using Plaintiffs' confidential information to perform services for J2 and Zavation.  Among other things, as described in more detail below, in April and May 2015, Kyle Johnson received Precision Spine's confidential computer programming information that details how to make Precision Spine's Posterior Cervical System from a current Precision Spine employee, James Cochran.

125.   Upon information and belief, at the time Johnson, Zavation and/or J2 hired Kyle Johnson, they were aware of the terms of his Confidentiality Agreement, yet tortiously interfered with Kyle Johnson's contractual obligations owed to PSI and the predecessor entities to Precision Spine by hiring him to perform similar services for Zavation.

126.   Moreover, despite agreeing that he had access to Plaintiffs' employee information, and that such information was confidential, upon information and belief, since joining Zavation and J2, Kyle Johnson, either directly or through others, has approached a number of valuable Precision Spine employees to encourage them to join Zavation.

### *Claude Scott Smith*

127.    Claude Scott Smith ("Smith") worked as the General Manager and Comptroller for Spinal, responsible for the administrative and financial processes of the company.  He was employed by the company from December 8, 2008 to November 28, 2014.

128.    On March 10, 2010, Smith entered into a "Non-Competition Agreement" with Spinal USA, LLC, pursuant to which he agreed that, for a period of one (1) year after he ceased employment, he would "not engage in any business or perform any service, directly or indirectly, in competition with the Business of the Company" anywhere in the United States.

129.    On April 28, 2012, Smith entered into a "Confidentiality Agreement" with Spinal USA, LLC.  Pursuant to Section 1 of that agreement, Smith acknowledged that he would "obtain or be given access to Precision Spine's confidential information, including but not limited to "employee information and personal data," as well as "strategic business plans, business and distribution models, business opportunities, intellectual property and trade secrets, processes, programs, techniques, methodologies, designs, prospects, customers, competitors, suppliers, pricing and other commercial, technical or operational information."  Smith further acknowledged that the unauthorized disclosure of such information would harm the company and agreed that he would not "directly or indirectly use in any unauthorized manner, or disclose to any third party," Spinal's confidential and proprietary information.

130.    Finally, Smith agreed to return any confidential information in his possession at the time of his termination of employment.

131.    Smith was a valuable employee.  His personnel file reflects that he consistently received high performance evaluations and commensurate raises as a result.  During his tenure,

31

Smith was promoted to General Manager and Comptroller.  Moreover, effective January 1, 2011, Smith received 60,000 units of Class B Membership Interest in Spinal USA, LLC.

132.    At the time Smith tendered his resignation, he told Precision Spine's Chief Executive Officer, Jim Pastena, that he was not joining Zavation.  He later told two other Precision Spine employees that he was going to be consulting for Johnson on the development of PEEK lumbar implants.

133.    Upon information and belief, Smith currently provides consulting work for Zavation in violation of his 1-year post employment non-competition obligations.

134.    Upon information and belief, at the time Johnson and Zavation hired Smith as a consultant, they were aware of the terms of his Non-Competition Agreement and his Confidentiality Agreement, yet tortiously interfered with Smith's contractual obligations owed to PSI and the predecessor entities to Precision Spine by hiring him to perform similar services as a consultant for Zavation.

### *Ryan Ratcliff*

135.    Ryan Ratcliff ("Ratcliff") joined Precision Spine on January 16, 2012.  He started as a Purchasing Expeditor and, by the time he left the company on March 28, 2014, he served as the company's Purchasing Manager.

136.    On January 16, 2012, Ratcliff entered into a Confidentiality Agreement with Spinal USA, LLC in order to gain access to Spinal's confidential information and trade secrets.

137.    Pursuant to his Confidentiality Agreement, Ratcliff acknowledged that would "obtain or be given access to" confidential information regarding Spinal and its business, including, but not limited to "employee information and personal data, surgical implants, surgical devices, surgical products, surgical equipment, inventions, strategic business plans, business and

32

84723736

distribution models, business opportunities, intellectual property and trade secrets, processes, programs, techniques, methodologies, designs, prospects, customers, competitors, suppliers, pricing and other commercial, technical or operational information." Ratcliff further acknowledged that the unauthorized disclosure of such information would harm the company and agreed that he would not "directly or indirectly use in any unauthorized manner, or disclose to any third party," Spinal's confidential and proprietary information.

138.    Ratcliff further agreed that all inventions, designs, devices and like materials that he helped create, develop, modify or improve during his employment with the company "shall be and shall remain the exclusive property of the Company."

139.    Finally, Ratcliff agreed to return any confidential information in his possession at the time of his termination of employment.

140.    On December 15, 2014, Ratcliff provided written notice of his resignation of employment from Precision Spine, effective January 2, 2015.

141.    Upon information and belief, Ratcliff now works for Zavation.

142.    During his nearly three year tenure at Precision Spine, Ratcliff had access to confidential and proprietary information and trade secrets protected from disclosure by the terms of his agreement with the company. Among other things, as a Purchasing Manager, Ratcliff had access to all of Precision Spine's proprietary suppliers, customers, business and distribution models, pricing, technical and operational information, and related information that he was prohibited from disclosing to third parties pursuant to the terms of his Confidentiality Agreement.

143.    Upon information and belief, at the time Johnson and Zavation hired Ratcliff, they were aware of the terms of his Confidentiality Agreement, yet tortiously interfered with Ratcliff's

33

contractual obligations owed to PSI and the predecessor entities to Precision Spine by hiring him to perform similar services for Zavation.

### . *Jerry Page and Mike Carroll*

144.    Johnson's and Zavation's campaign to target Plaintiffs' employees to grow its business has even reached Precision Spine's machine operators.

145.    Upon information and belief, Zavation hired Jerry Page (who resigned from Precision Spine effective November 20, 2014) and Mike Carroll (who resigned from Precision Spine effective April 14, 2015), both of whom had worked as CNC machine operators for Precision Spine.

146.    Both Page and Carroll signed the same Confidentiality Agreement that Kyle Johnson and Ratcliff signed.

147.    During their tenure at Precision Spine, Page and Carroll had access to confidential and proprietary information and trade secrets protected from disclosure by the terms of their agreement with the company.

148.    Upon information and belief, both Page and Carroll left Precision Spine to work for Zavation.

149.    Upon information and belief, at the time Johnson and Zavation hired Page and Carroll, they were aware of the terms of their Confidentiality Agreements, yet tortiously interfered with Page's and Carroll's contractual obligations owed to PSI and the predecessor entities to Precision Spine by hiring them to perform similar services for Zavation.

34

**Zavation and J2 Obtain Precision Spine's Confidential Information and Trade Secrets to Facilitate Zavation's Development and Manufacture of a Competing Posterior Cervical System**

150.    At least two Precision Spine employees -- John Wilson and James Cochran -- recently breached their obligations to Precision Spine by disclosing confidential information regarding Precision Spine's SureLOK™ *PC* Posterior Cervical System to Zavation and/or J2.

### *John Wilson*

151.    John Wilson ("Wilson") has been a Precision Spine engineer since March 21, 2011. He used to work under Cummins until Cummins left Precision Spine to join Zavation.

152.    Although Cummins has worked for Zavation since 2014, Wilson continued to keep him apprised of noteworthy Precision Spine news. For example, on July 9, 2015, Precision Spine internally circulated a Press Release via email to all Precision Spine employees announcing the appointment of two new members of the Precision Spine Board of Directors. Later that same day, Cummins forwarded a copy of this internal Precision Spine email to a number of the Former Precision Spine Employees from his personal email account (frankiecummins@live.com), except he mistakenly sent it to Smith's and Phillips' prior Precision Spine e-mail accounts (scott.smith@precisionspine.com and milton.phillips@preciosnspine.com). For business reasons, Smith's Precision Spine email account is still active, and, as a result, Precision Spine discovered what had transpired.

153.    Upon investigation, Precision Spine learned that only one employee -- John Wilson -- sent the Press Release outside the company; he sent it to his personal Yahoo email account. Wilson then sent Cummins the Press Release from his personal Yahoo email account.

154.    In fact, Precision Spine has now learned that, over the past year, Wilson emailed to his personal Yahoo account a series of confidential Precision Spine drawings, CAD models and testing data and studies for its SureLOK™ *PC* Posterior Cervical System to his personal

35

Yahoo email address, jnwilson157@yahoo.com. Collectively, the emails contain all of the pertinent documents relating to the design of this product, such as diagrams and CAD Models, as well as all the testing data and studies that Precision Spine spent hundreds of thousands of dollars to compile in order to obtain FDA approval to market the product. Precision Spine's SureLOK™ *PC* Posterior Cervical System is a valuable product, worth millions of dollars to the company. It is one of the more expensive products to develop, and thus there is less competition in the marketplace.

155.    Wilson does not work and has never worked on Precision Spine's SureLOK™ *PC* Posterior Cervical System, and thus had no business reason or authorization to obtain or send these documents to his personal email account.

156.    Wilson's former boss, Cummins, a former Precision Spine engineer who now works for Zavation, did work on this system while employed by Precision Spine, as reflected on the diagrams Wilson emailed to his personal email address.

157.    On July 22, 2015, Wilson admitted that he downloaded these documents and sent them to his personal email account in order to send them to Cummins without Precision Spine's knowledge. Wilson sent these documents to Cummins because Cummins had contacted him and asked him to do so.

158.    Precision Spine's Employee Handbook & Guidelines "strictly prohibited" Wilson from using the company's computer for "sending, receiving, displaying, printing or otherwise disseminating confidential, proprietary business information or trade secrets in violation of company policy or proprietary agreements."

159.    In addition, like the Former Precision Spine Employees, Wilson is bound by certain confidentiality obligations, which prohibit the transfer of these documents to his personal

36

email account.  Wilson's confidentiality obligations to Precision Spine are memorialized by the terms of his April 8, 2011 Non-Competition and Confidentiality Agreement with Spinal USA, LLC.

160.    Wilson admits that he transferred the documents from his personal Yahoo email account to Cummins at Zavation in breach of his obligations to Precision Spine under his Non-Competition and Confidentiality Agreement.

161.    Wilson's actions also breached his duty of loyalty to Precision Spine.

162.    Upon information and belief, Cummins and Zavation tortiously interfered with Wilson's contractual obligations owed to Precision Spine.

163.    Upon information and belief, Cummins and Zavation are using this confidential and proprietary information in order to, among other things, develop a competing posterior cervical system without investing the substantial time and cost Precision Spine has invested to develop its product.

### *James Cochran*

164.    James Cochran ("Cochran") was a Machinist for Precision Spine and, like Wilson and the Former Precision Spine Employees, Cochran is bound by certain confidentiality obligations.  Cochran's obligations are memorialized in a January 4, 2009 Confidentiality Agreement with Spinal USA, LLC and the Precision Spine Employee Handbook & Guidelines.

165.    Precision Spine recently learned that Cochran also violated his confidentiality obligations to Precision Spine by e-mailing confidential Precision Spine documents to Kyle Johnson at J2 in April and May of 2015.  Specifically, Cochran e-mailed technical computer programming data and information to Kyle Johnson that reveals how to manufacture Precision Spine's SureLOK™ *PC* Posterior Cervical System.  This information is vital, and would allow J2

37

to manufacture the products that are detailed in the drawings and CAD models Wilson transferred to his personal email address.

166.    On or about July 10, 2015, Precision Spine determined that Cochran had sent Kyle Johnson at least four emails that both provided Kyle Johnson and J2 with Precision Spine's confidential information and showed Kyle Johnson how to read that information. On April 8, 2015, Cochran sent Kyle Johnson an excel spreadsheet with calculations. His transmittal message read:

> This is latest, look on bottom left you can choose between 0-20 and 0-30 thread whirlers, It does make difference.

167.    The next day, April 9, 2015, Cochran provided Kyle Johnson with a "shortcut" he uses to obtain "good data" from the spreadsheet he sent the day before. He also sent a word document in a separate email that day with measurements that he explained should be located under the "Z heading" in the excel spreadsheet.

168.    On May 27, 2015, Cochran sent Kyle Johnson a document with "macros in it," and identified the "key ones."

169.    Since J2 and Kyle Johnson are not manufacturing anything for Precision Spine, no legitimate reason exists for Cochran to have sent this information to J2.

170.    When Precision Spine interviewed Cochran about these emails on July 22, 2015, Cochran admitted that he sent the information to Kyle Johnson, but denied doing anything wrong, claiming that what he sent was generic, and not confidential or proprietary. Despite this claim, Cochran admitted that the data he sent was generated in accordance to the design specifications developed and owned by Precision Spine. Furthermore, Precision Spine has learned that Cochran used his Precision Spine computer to download onto a removable disk program files and manuals of Precision Spine machines that were not related to his job function at all.

171.   In so doing, Cochran breached his obligations under the terms of his Non-Competition and Confidentiality Agreement and Precision Spine's Employee Handbook & Guidelines.

172.   Cochran's actions also breached his duty of loyalty to Precision Spine.

173.   Upon information and belief, J2 and Zavation encouraged Cochran to breach his contractual and fiduciary obligations to Precision Spine.

174.   Upon information and belief, Zavation and J2 are using these documents so that it can manufacture a competing posterior cervical system without investing the substantial time, effort, and cost Precision Spine has invested to develop its product.

175.   On July 21, 2015, Cochran resigned and advised certain Precision Spine employees that he was leaving to work for Zavation.

**Zavation and J2 Have Harmed and Continue to Harm Precision Spine**

176.   While Precision Spine has managed to grow its business since Johnson's departure and successfully transferred the epicenter of the engineering and design of its intellectual property from Mississippi to New Jersey, the scheme by Johnson and Zavation to raid Precision Spine's work force and steal its trade secrets with the intention to harm Precision Spine has and continues to irreparably harm Precision Spine.

177.   In fact, Zavation is actively soliciting and hiring Precision Spine employees today. In addition to Cochran, whom Zavation just hired, on July 21, 2015 Deidred Hancock Garrett, a Precision Spine QA Inspector, tendered her resignation and advised that she too is leaving to work for Zavation.  Moreover, on July 23, 2015, Phillip Douglas, a Precision Spine Assembler, tendered his resignation and advised that he is also leaving to work for Zavation.

39

84723736

178.    Precision Spine has undoubtedly lost business and valuable trade secrets as a result of the Defendants' conduct, as well as goodwill and its competitive advantage, and that irreparable harm is likely to continue if Zavation continues to follow its pattern of hiring key Precision Spine employees and encouraging them to disclose Precision Spine's confidential information.

179.    The latest discovery of violations by Wilson and Cochran (and Zavation's recent offer of employment to Cochran) makes clear that Zavation has no intention to cease its tortious conduct and unfair competition.  Absent injunctive relief, Defendants will continue to target Precision Spine employees and continue to coerce them to improperly disclose Precision Spine's confidential information.

**COUNT ONE**
**(Against All Defendants)**
**(Tortious Interference with Contract Between Spinal and Phillips)**

180.    Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

181.    On September 13, 2010, Phillips entered into a Non-Competition and Confidentiality Agreement with Spinal.

182.    Defendants tortiously interfered with Phillips' contractual obligations to Spinal.

183.    As a result of Defendants' tortious interference, Phillips breached his contractual obligations to Spinal.

184.    Upon information and belief, Defendants' intentional interference was malicious, unjustified and accomplished through wrongful means.

185.    Precision Spine has suffered irreparable harm and been damaged as a result.

40

84723736

## COUNT TWO
### (Against All Defendants)
### (Tortious Interference with Contract Between Spinal and Cummins)

186.   Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

187.   On January 24, 2011, Cummins entered into a Non-Competition and Confidentiality Agreement with Spinal.

188.   Defendants tortiously interfered with Cummins' contractual obligations to Spinal.

189.   As a result of Defendants' tortious interference, Cummins breached his contractual obligations to Spinal.

190.   Upon information and belief, Defendants' intentional interference was malicious, unjustified and accomplished through wrongful means.

191.   Precision Spine has suffered irreparable harm and been damaged as a result.

## COUNT THREE
### (Against All Defendants)
### (Tortious Interference with Contract Between Spinal and Kyle Johnson)

192.   Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

193.   On August 25, 2008, Kyle Johnson entered into a Confidentiality Agreement with Spinal.

194.   Defendants tortiously interfered with Kyle Johnson's contractual obligations to Spinal.

195.   As a result of Defendants' tortious interference, Kyle Johnson breached his contractual obligations to Spinal.

196.   Defendants' tortious interference caused Kyle Johnson to breach his contractual obligations to Spinal.

84723736

197.   Upon information and belief, Defendants' intentional interference was malicious, unjustified and accomplished through wrongful means.

198.   Precision Spine has suffered irreparable harm and been damaged as a result.

## COUNT FOUR
### (Against All Defendants)
### (Tortious Interference with Contract Between Spinal and Smith)

199.   Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

200.   On March 10, 2010, Smith entered into a Non-Competition Agreement with Spinal.

201.   On April 28, 2012, Smith entered into a Confidentiality Agreement with Spinal.

202.   Defendants tortiously interfered with Smith's contractual obligations to Spinal.

203.   As a result of Defendants' tortious interference, Smith breached his contractual obligations to Spinal.

204.   Upon information and belief, Defendants' intentional interference was malicious, unjustified and accomplished through wrongful means.

205.   Precision Spine has suffered irreparable harm and been damaged as a result.

## COUNT FIVE
### (Against All Defendants)
### (Tortious Interference with Contract Between Spinal and Ratcliff)

206.   Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

207.   On January 16, 2012, Ratcliff entered into a Confidentiality Agreement with Spinal.

208.   Defendants tortiously interfered with Ratcliff's contractual obligations to Spinal.

42

84723736

209.   As a result of Defendants' tortious interference, Ratcliff breached his contractual obligations to Spinal.

210.   Upon information and belief, Defendants' intentional interference was malicious, unjustified and accomplished through wrongful means.

211.   Precision Spine has suffered irreparable harm and been damaged as a result.

## COUNT SIX
### (Against All Defendants)
### (Tortious Interference with Contract Between Spinal and Carroll)

212.   Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

213.   On November 14, 2011, Carroll entered into a Confidentiality Agreement with Spinal.

214.   Defendants tortiously interfered with Carroll's contractual obligations to Spinal.

215.   As a result of Defendants' tortious interference, Carroll breached his contractual obligations to Spinal.

216.   Defendants' tortious interference caused Carroll to breach his contractual obligations to Spinal.

217.   Upon information and belief, Defendants' intentional interference was malicious, unjustified and accomplished through wrongful means.

218.   Precision Spine has suffered irreparable harm and been damaged as a result.

## COUNT SEVEN
### (Against All Defendants)
### (Tortious Interference with Contract Between PSI and Page)

219.   Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

43

84723736

220.     On September 16, 2013, Page entered into a Non-Competition and Confidentiality Agreement with PSI.

221.     Defendants tortiously interfered with Page's contractual obligations to PSI.

222.     As a result of Defendants' tortious interference, Page breached his contractual obligations to PSI.

223.     Upon information and belief, Defendants' intentional interference was malicious, unjustified and accomplished through wrongful means.

224.     Precision Spine has suffered irreparable harm and been damaged as a result.

### COUNT EIGHT
#### (Against All Defendants)
#### (Tortious Interference with Contract Between Spinal and Wilson)

225.     Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

226.     On April 8, 2011, Wilson entered into a Non-Competition and Confidentiality Agreement with Spinal.

227.     Defendants tortiously interfered with Wilson's contractual obligations to Spinal.

228.     As a result of Defendants' tortious interference, Wilson breached his contractual obligations to Spinal.

229.     Upon information and belief, Defendants' intentional interference was malicious, unjustified and accomplished through wrongful means.

230.     Precision Spine has suffered irreparable harm and been damaged as a result.

### COUNT NINE
#### (Against All Defendants)
#### (Tortious Interference with Contract Between Spinal and Cochran)

231.     Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

44

84723736

232.    On January 4, 2009, Cochran entered into a Non-Competition and Confidentiality Agreement with Spinal.

233.    Defendants tortiously interfered with Cochran's contractual obligations to Spinal.

234.    Defendants' tortious interference caused Cochran to breach his contractual obligations to Spinal.

235.    Upon information and belief, Defendants' intentional interference was malicious, unjustified and accomplished through wrongful means.

236.    Precision Spine has suffered irreparable harm and been damaged as a result.

## COUNT TEN
### (Against All Defendants)
### (Tortious Interference with Contract Between Spinal and Walker)

237.    Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

238.    On March 24, 2009, Walker entered into an employment agreement with Spinal.

239.    Defendants tortiously interfered with Walker's contractual obligations to Spinal.

240.    Defendants' tortious interference caused Walker to breach his contractual obligations to Spinal.

241.    Upon information and belief, Defendants' intentional interference was malicious, unjustified and accomplished through wrongful means.

242.    Precision Spine has suffered irreparable harm and been damaged as a result.

## COUNT ELEVEN
### (Against All Defendants)
### (Misappropriation of Trade Secrets and Confidential Information)

243.    Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

84723736

244.   Precision Spine's confidential and proprietary information includes, among other things, Precision Spine's employee information and personal data, surgical implants, surgical devices, surgical products, surgical equipment, inventions, strategic business plans, business and distribution models, business opportunities, intellectual property and trade secrets, processes, programs, techniques, methodologies, designs, prospects, customers, competitors, suppliers, pricing and other commercial, technical or operational information.

245.   Precision Spine's confidential and proprietary information includes the drawings, CAD models, designs, testing procedures, manufacturing processes, computer codes, calculations, and other data and information used by Precision Spine to create, develop, manufacture and market spinal implants, devices and related products.

246.   This information constitutes trade secrets because Precision Spine derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is subject to reasonable efforts to maintain its secrecy.

247.   Defendants have actually misappropriated Precision Spine's confidential and proprietary information and trade secrets regarding its SureLOK™ *PC* Posterior Cervical System, and upon information and belief, have misappropriated confidential and proprietary information and trade secrets regarding several other Precision Spine products, including without limitation, its Slimplicity® SOLO uniplate and its Vault™ *C* product.

248.   Moreover, Defendants threaten to inevitably misappropriate Precision Spine's confidential and proprietary information and trade secrets without Precision Spine's consent in violation of New Jersey law.  Zavation and/or J2 cannot hire Precision Spine employees,

46

including the Former Precision Spine Employees, into similar positions at Zavation and/or J2 without Zavation and/or J2 and/or the Former Precision Spine Employees utilizing and disclosing Precision Spine's confidential information.

249.   Defendants will be or are being unjustly enriched by the actual and/or threatened misappropriation of Precision Spine's trade secrets and confidential and proprietary information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Precision Spine's trade secrets and confidential information.

250.   Upon information and belief, Defendants actual and/or threatened misappropriation has been willful and malicious.

251.   Precision Spine has suffered irreparable harm and been damaged as a result.

**COUNT TWELVE**
**(Against All Defendants)**
**(Misappropriation of Trade Secrets and Confidential Information**
**in Violation of N.J.S.A. 56:15-1, et seq.)**

252.   Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

253.   Defendants actual and threatened misappropriation of Precision Spine's trade secrets also constitutes a violation of the New Jersey Trade Secret Act, N.J.SA. § 56:15-1 et-seq.

254.   Upon information and belief, Defendants actual and/or threatened misappropriation has been willful and malicious, entitling Precision Spine to reasonable attorneys' fees and costs pursuant to N.J.S.A. § 56:15-6.

255.   Precision Spine has suffered irreparable harm and been damaged as a result.

47

## COUNT THIRTEEN
### (Against All Defendants)
### (Corporate Raiding)

256.    Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

257.    Johnson and Zavation organized a scheme to raid Precision Spine's employees, beginning at the end of 2013, as a means to improperly and illegally acquire a skilled workforce with relevant knowledge of Precision Spine's confidential and proprietary designs, data, testing procedures, manufacturing processes and other information relevant to its successful development of spinal implants and related products in order to form a competing spinal business and unfairly compete with Precision Spine.

258.    Johnson and Zavation maliciously executed this scheme with the intention to harm Precision Spine.

259.    Pursuant to Johnson and Zavation's scheme, their solicitation and hiring of Precision Spine employees was undertaken with unlawful and improper purpose.

260.    Pursuant to Johnson and Zavation's scheme, their solicitation and hiring of Precision Spine employees occurred with unlawful and improper means.

261.    Until Johnson and Zavation carried out their scheme, Precision Spine had maintained valid relationships with the Former Precision Spine Employees and expected to benefit from the knowledge they obtained and provided in connection with developing, manufacturing, and/or distributing Precision Spine's spinal products.  Precision Spine had a reasonable expectation that it would maintain those employee relationships and that they would not be unjustifiably disrupted.

262.    Precision Spine has suffered irreparable harm and been damaged as a result.

84723736

## COUNT FOURTEEN
### (Against All Defendants)
### (Tortious Interference With Prospective Economic Advantage)

263.    Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

264.    There exist valid employment agreements between Precision Spine and certain of its employees, including Wilson and Cochran, that constitute business relationships for which Precision Spine has a reasonable expectation of economic benefit.

265.    Upon information and belief, Defendants have interfered and are seeking to interfere with Precision Spine's business relationships with certain of its employees, including the Former Precision Spine Employees, Wilson and Cochran, and have done so with an improper motive and intent to harm Precision Spine and by improper means.

266.    Precision Spine has lost a business advantage as a result.

267.    Precision Spine has suffered irreparable harm and been damaged as a result.

## COUNT FIFTEEN
### (Against Johnson and Zavation)
### (Aiding And Abetting Breach Of Fiduciary Duty By Kyle Johnson)

268.    Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

269.    As a Precision Spine's Director of Manufacturing, Kyle Johnson owed a fiduciary duty of loyalty to Precision Spine during the course of his employment.

270.    Among other things, Kyle Johnson communicated with at least two parts manufacturers on behalf of Zavation while he remained an employee of Precision Spine, even using his Precision Spine email to do so, in breach of his duty of loyalty to Precision Spine.

49

271.   Upon information and belief, Zavation and Johnson knowingly encouraged, aided and/or abetted Kyle Johnson to breach his fiduciary obligations to Precision Spine.

272.   Upon information and belief, Zavation's and Johnson's aiding and abetting of fiduciary breaches has been willful and malicious.

273.   Precision Spine has suffered irreparable harm and been damaged as a result.

## COUNT SIXTEEN
### (Against Johnson and Zavation)
### (Aiding And Abetting Breach Of Fiduciary Duty By John Wilson)

274.   Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

275.   As a Precision Spine engineer, John Wilson owed a fiduciary duty of loyalty to Precision Spine during the course of his employment.

276.   Wilson transferred certain of Precision Spine's confidential and propriety trade secrets and information regarding its SureLOK™ *PC* Posterior Cervical System to his personal email account, without authorization, and then forwarded that information to Cummins, who now works for Zavation, in breach of his duty of loyalty to Precision Spine.

277.   Upon information and belief, Zavation and Johnson, through Cummins, knowingly encouraged, aided and/or abetted Wilson to breach his fiduciary obligations to Precision Spine.

278.   Upon information and belief, Zavation's and Johnson's aiding and abetting of fiduciary breaches has been willful and malicious. [1]

279.   Precision Spine has suffered irreparable harm and been damaged as a result.

## COUNT SEVENTEEN
### (Against J2)
### (Aiding And Abetting Breach Of Fiduciary Duty By James Cochran)

84723736

280.   Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

281.   As a Precision Spine employee, James Cochran owed a fiduciary duty of loyalty to Precision Spine during the course of his employment.

282.   Cochran emailed certain of Precision Spine's confidential and propriety trade secrets and information regarding its Posterior Cervical System to J2, without authorization, in breach of his duty of loyalty.

283.   Upon information and belief, J2 knowingly encouraged, aided and/or abetted Wilson to breach his fiduciary obligations to Precision Spine.

284.   Upon information and belief, J2's aiding and abetting of fiduciary breaches has been willful and malicious.

285.   Precision Spine has suffered irreparable harm and been damaged as a result.

**COUNT EIGHTEEN**
**(Unfair Competition)**

286.   Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

287.   Defendants undertook the foregoing acts of hiring key Precision Spine employees and encouraging those employees to disclose Precision Spine's confidential information in order to form a competing product line of spinal and related products without incurring the costs to develop them and gain an unfair competitive advantage over Precision Spine.

288.   Defendants willfully undertook the foregoing acts with knowledge of and disregard for Precision Spine's rights, and with the intention of harming Precision Spine.

289.   As a result of Defendants' actions, they are unfairly competing with Precision Spine in the marketplace for spinal and related products.

51

290.   Upon information and belief, Defendants unfair competition has been willful and malicious.

291.   Precision Spine has suffered irreparable harm and been damaged as a result.

## COUNT NINETEEN
### (Breach Of Contract Against Johnson)

292.   Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

293.   Johnson entered into a Settlement Agreement with Spinal, pursuant to which he agreed to certain enforceable covenants, including a one-year covenant not to compete with Spinal or to solicit or employ any Spinal employees, and a covenant against the disclosure of Confidential Information, as that term is defined in the Operating Agreement.

294.   Immediately upon execution of the Settlement Agreement, Johnson embarked on a continuous pattern and scheme to breach each of those covenants and he continues to do so to this day.

295.   Among other things, Johnson breached his non-competition covenant by forming Zavation and developing a competing line of spinal and related products immediately upon (and even before) he signed the Settlement Agreement, breached his non-solicitation covenant by hiring Walker soon after he signed the Settlement Agreement, and he continuously breached his confidentiality covenant by misappropriating Precision Spine's confidential and proprietary information for the benefit of the Defendants, including, among other things, his knowledge of Precision Spine's workforce, products, designs, and processes, all of which he used to pilfer Precision Spine employees and tortiously interfere with their contractual obligations to Precision Spine.

52

84723736

296.     Because Johnson immediately and continuously breached the non-competition covenant contained in the Settlement Agreement, that one-year covenant has not yet begun to run and remains in effect to this day.

297.     Pursuant to Paragraph 15 of the Settlement Agreement, Spinal is entitled to recover its reasonable attorneys' fees and costs as a result of Johnson's breaches.

298.     Precision Spine has suffered irreparable harm and been damaged as a result.

### COUNT TWENTY
### (Breach Of Good Faith And Fair Dealing Against Johnson)

299.     Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

300.     When Spinal entered into the Settlement Agreement with Johnson, and paid him substantial consideration, it bargained for the expectation that Johnson would not immediately form a competing spinal business and would not attempt, at any time thereafter, to misappropriate the valuable information he had obtained during his tenure as a Founding Member and officer of Spinal to his benefit, and to the detriment of Spinal.

301.     Johnson stripped the value of the Settlement Agreement from Spinal when he immediately embarked on the foregoing campaign to develop a competing spinal company and unlawfully compete with Precision Spine by, among other things, improperly using the intellectual property Spinal invested millions of dollars to develop.

302.     Johnson's conduct, detailed above, destroyed Spinal's right to receive the benefit of the bargain.

303.     As a result, Johnson breached the implied covenant of good faith and fair dealing inherent in the Settlement Agreement he entered into with Spinal.

53

304.    Precision Spine has suffered irreparable harm and been damaged as a result.

## COUNT TWENTY-ONE
### (Fraud in the Inducement Against Johnson)

305.    Plaintiffs reallege and incorporate herein by reference all allegations contained in the Paragraphs above as if the same were set forth fully herein.

306.    When Johnson negotiated and entered into the Settlement Agreement with Spinal, he concealed that he had already formed a new company in order to compete with Precision Spine in its "Core Business" within one year after the execution of the Settlement Agreement, and that he had plans to hire Walker, Spinal's Director of Engineering, to assist him in doing so.

307.    By deliberately concealing the material facts from Spinal, Johnson misrepresented his intentions to comply with the non-competition, non-solicitation and confidentiality obligations that existed in the Operating Agreement, and thereby fraudulently induced Spinal to enter into the Settlement Agreement, pay him substantial consideration, and provide certain releases.

308.    Johnson had a duty to disclose the foregoing material facts to Spinal and knowingly, deliberately and intentionally concealed them, misrepresenting his actual intentions with the purpose of inducing Spinal to rely upon those misrepresentations and enter into the Settlement Agreement.

309.    Spinal reasonably relied upon Johnson's misrepresentations to its detriment, as a result of which it has suffered damages.

310.    As a consequence of Johnson's fraudulent conduct, Plaintiffs are entitled to compensatory and punitive damages.

84723736

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment against Defendants Jeffrey Johnson, Zavation, LLC and J2 Manufacturing, LLC:

a.      Temporarily, preliminarily and permanently enjoining Defendants from using or disclosing Precision Spine's confidential and proprietary information and trade secrets, including, but not limited to, such information obtained, directly or indirectly, from John Wilson or James Cochran, and/or information concerning Precision Spine's SureLOK™ *PC* Posterior Cervical System, and from developing, seeking FDA approval for, or marketing a posterior cervical system similar in functionality to Precision Spine's SureLOK™ PC Posterior Cervical System, as to Counts Eleven through Thirteen and Fifteen through Twenty;

b.      Temporarily, preliminarily and permanently enjoining Defendants from hiring or allowing any current Precision Spine's employees, including but not limited to John Wilson, James Cochran, Deidred Hancock Garret and Phillip Douglas, to commence employment or provide services to any of the Defendants, as to Counts Eleven through Twenty;

c.      Temporarily, preliminarily and permanently enjoining Defendants from encouraging, inducing and/or facilitating current and former Precision Spine employees to breach their contractual obligations to Precision Spine, as to Counts One through Ten.

d.      Awarding compensatory damages in an amount to be determined at trial as to all Counts;

e.      Awarding punitive damages as to Counts One through Eighteen and Twenty-One;

f.      Awarding reasonable attorneys' fees and costs, as to Counts Twelve and Nineteen; and

g.      Granting such other and further relief as the Court deems just and proper, as to all Counts.

84723736

DENTONS US LLP

By: _____

Brian S. Cousin, Esq.
Marc S. Friedman, Esq.
Jonathan S. Jemison, Esq.
Lindsay F. Ditlow, Esq.

*Attorneys for Plaintiffs*

Dated:  July 24, 2015

56

84723736

## DESIGNATION OF TRIAL COUNSEL

Brian S. Cousin, Esq., Dentons US LLP, is hereby designated as trial counsel on behalf of Plaintiffs in this matter.

DENTONS US LLP

By: _____

Brian S. Cousin, Esq.
Marc S. Friedman, Esq.
Jonathan S. Jemison, Esq.
Lindsay F. Ditlow, Esq.

*Attorneys for Plaintiffs*

Dated:  July 24, 2015

57

84723736

## CERTIFICATION PURSUANT TO R. 1:38-7(c)

Pursuant to R. 1:38-7(c), attorneys for Plaintiffs certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

DENTONS US LLP

By: _____
Brian S. Cousin, Esq.
Marc S. Friedman, Esq.
Jonathan S. Jemison, Esq.
Lindsay F. Ditlow, Esq.

*Attorneys for Plaintiffs*

Dated:  July 24, 2015

58

84723736

## CERTIFICATION PURSUANT TO R. 4:5-1(b)(2)

Pursuant to R. 4:5-1(b)(2), I hereby certify that matter in controversy is not the subject of any other lawsuit presently pending or contemplated in any other Court or arbitration proceeding. I further certify that I am not aware of any other party that should be joined pursuant to R. 4:28 and R. 4:29-1(b).

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the statements are willfully false, I am subject to punishment.

DENTONS US LLP

By: _____

Brian S. Cousin, Esq.
Marc S. Friedman, Esq.
Jonathan S. Jemison, Esq.
Lindsay F. Ditlow, Esq.

*Attorneys for Plaintiffs*

Dated:  July 24, 2015

84723736